633 A.2d 589

**Charles L. BERRINGTON, Appellee,**

v.

**Claire L. BERRINGTON, Appellant.**

Supreme Court of Pennsylvania.

Argued March 10, 1993.

Decided Nov. 12, 1993.

394

Patricia G. Miller, Amy Acheson, Reed, Smith, Shaw & McClay, for appellee.

Richard R. Isaacson, Berlin, Boas & Isaacson, Pittsburgh, for appellant.

Stewart B. Barmen, Buchanan Ingersoll, P.C., Philadelphia, for Pennsylvania Chapter of American Academy of Matrimonial Lawyers.

Vicki L. Beatty, Women's Bar Ass'n of Western Pennsylvania, Frederick N. Frank, Pittsburgh, for Allegheny County Bar Ass'n, Family Law Section.

Sharon J. Phillips, Pepper, Hamilton & Scheetz, Linda Wharton, Women's Law Project, Philadelphia, for Women's Law Project, Now Legal Defense and Educ. Fund, Pennsylvania Nat. Organization for Women, Senior Citizen Judicare

Project, Community Women's Educ. Project, Supportive Older Women's Network, Nat. Center on Women and Family Law, Inc., Nat. Women's Law Center, Northwest Women's Law Center, Women's Law Center, Connecticut Women's Educ. and Legal Fund, and Older Women's League.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is a divorce case involving equitable distribution of a defined benefit pension fund. The issue presented is whether the non-employee spouse's share in a deferred distribution of a pension should be based upon the salary which the employee-spouse earned at the date of separation or upon the amount earned at some post-separation retirement date. The trial court determined that the marital share should be based on the employee's pension to be received at the time the pension plan enters pay status. Superior Court reversed, holding that the amount to be awarded the non-employee spouse should be based on the employee's salary at the date of separation, but augmented by growth in the pension fund based on factors other than the employer's or employee's contributions to the fund after the date of separation. 409 Pa.Super. 355, 372, 598 A.2d 31, 40 (1991). We affirm.

The parties were married on May 7, 1955. From marriage until husband left the marital home on July 15, 1984, he was a participant in the retirement plan of the Westinghouse Electric Corporation, his employer. After separation, husband continued to work for Westinghouse and to participate in the retirement plan. On January 9, 1985, husband filed a complaint in divorce. Divorce was granted on July 27, 1987 and the trial court retained jurisdiction over unresolved claims.

Among the marital assets at issue in the equitable distribution was husband's Westinghouse pension plan. This plan is a defined benefit plan consisting of a basic and a supplemental

portion.[1]  Husband participates in both.  Under the supplemental plan, the employer's contributions are based on the employee's contributions.  If the employee makes no contributions, the employer makes none.  Between the date of separation and February 28, 1990, husband contributed $14,770.16 to the basic and supplemental portions of the plan.

Husband also participated in the Westinghouse executive benefit plan, which is available only to employees in an executive position for five continuous years preceding retirement.  Pursuant to this plan, the pension benefit per month is determined by multiplying an executive pension multiplier (the employee's years of service at retirement multiplied by 1.47%) by the average of the highest five months' salaries for each year of the ten years immediately preceding retirement.

The parties reached a settlement agreement concerning equitable distribution which provided that wife was to receive non-modifiable alimony in the amount of fifteen hundred dollars per month until wife cohabited or remarried, husband became 65, husband retired from Westinghouse at age 62, 63, or 64, or the death of either party.  Wife was awarded 60% of marital property, including husband's pension, pursuant to this agreement.

Difficulty arose, however, when the parties attempted to prepare orders which embody the agreement.  Because the

1.  A defined benefit plan is one in which the employer promises a certain benefit;  a defined contribution plan is one in which the employer promises a certain contribution.

In a defined benefit plan, the benefit which is promised is calculated by a formula defined in the pension plan provisions.  The employer pays a specified benefit at retirement.  In some defined benefit plans, the employee contributes nothing;  in others, the benefits are based, in part, on what the employee contributes.  The employer's contribution to the plan, however, varies from year to year based on the amount which is needed at any particular time to pay the benefits which are due.  Individual accounts of each employee's contribution, if any, are maintained, but these accounts do not specify an employer contribution.

In a defined contribution plan, however, individual accounts specify not only the employee's contribution, but the employer's as well.  The benefits to be paid in the defined contribution plan, however, unlike those in the defined benefit plan, are not fixed, for they depend upon the performance of investments which are made with the contributions.

Westinghouse plan is a qualified plan under the Retirement Equity Act of 1984,[2] but the executive plan is not, the parties submitted two proposed orders, a Qualified Domestic Relations Order (QDRO)[3] and a Domestic Relations Order.[4] Husband's proposed orders calculated his pension benefit by using his annual salary on the date of separation. Wife's proposed orders calculated the amount of the pension benefit as of the deferred date, i.e., husband's retirement, husband's death, or the date wife begins receiving her portion of the benefit. 409 Pa.Super. at 358, 598 A.2d at 33.

The trial court entered an order based on wife's proposal and husband appealed. Superior Court reversed and this court granted allocatur.

**2.** The Retirement Equity Act of 1984 (REA) amended the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. and the Internal Revenue Code, 26 U.S.C. § 1 et seq., providing, inter alia, for the allocation and distribution of pension benefits at divorce:

> ERISA requires, as a condition of plan qualification, the inclusion of a spendthrift provision which prevents the assignment or alienation of pension benefits. This has sometimes presented a conflict to the plan administrator, whose duty extends not only to the plan and the plan participant, but also to the beneficiaries. The Retirement Equity Act eliminates this conflict by expressly providing for the allocation of pension benefits in matrimonial litigation. This allocation is achieved by means of a "qualified domestic relations order" (QDRO). The Act specifically exempts qualified domestic relations orders from the preemption provisions of ERISA.

Wilder, Mahood, and Greenblatt, *Pa. Family Law Prac. and Proc. Handbook* (2d ed), § 14–10.

**3.** A QDRO:

> is a domestic relations order which creates or recognizes the rights of an alternate payee to receive all or a portion of the benefits payable to a participant under the plan. To be "qualified," the order must contain certain required information and may not alter the amount or form of plan benefits.

Wilder, Mahood and Greenblatt, *Id.*

**4.** A domestic relations order:

> is a judgment, decree or order, including approval of a property settlement agreement by the court, which relates to the provision of child support, alimony payments or marital property rights of a spouse, former spouse, child or other dependent of a plan participant and is made pursuant to a state domestic relations law.

Wilder, Mahood, and Greenblatt, *Id.*

The trial court's rationale was that *LaBuda v. LaBuda,* 349 Pa.Super. 524, 503 A.2d 971 (1986), controls and compels its result. In that case, the court determined that the marital share of husband's pension was calculated by creating a fraction representing the number of years husband was in the pension plan as of the date of marital separation divided by the total number of years in the plan ("the coverture fraction")[5], multiplied by the monthly pension to be received by husband at his normal retirement, multiplied by wife's marital share as awarded at equitable distribution. This is the same method the trial court used in the present case. The trial court in this case expressed the belief that if wife were not paid in dollars calculated at the time of husband's retirement, her share of the pension accumulated during marriage would be reduced in value by inflation. In the trial court's words, wife would "be paid in the year 1994 with 1984 dollars even though his salary and thus his pension have been adjusted for inflation." Common Pleas Slip Op. at 9.

Superior Court reversed based on the following: (1) *LaBuda* was decided as it was because husband did not propose to the court another method of calculating the benefit owing to wife; (2) using husband's retirement benefits at the date of retirement as the base on which to calculate wife's marital share improperly uses husband's non-marital contributions, i.e., those made after separation, to determine marital property; (3) husband in this case has proposed a method of calculating wife's marital share of the pension which allows her to benefit from increases accruing from the date of separation until the date of payout without utilizing contributions made by husband after the date of separation.

5. The coverture fraction is defined as:

> that portion of the value of the pension that is attributable to the marriage. The numerator of the fraction is the total period of time the employee spouse was a participant in the plan from date of marriage until date of separation, and the denominator is the total period of participation in the pension plan.

*LaBuda v. LaBuda,* 349 Pa.Super. 524, 536 n. 9, 503 A.2d 971, citing *King v. King,* 332 Pa.Super. 526, 533, 481 A.2d 913, 916 (1984).

The pivotal questions are (1) whether the trial court's method of calculating wife's share of husband's pension requires husband to pay, in part, with non-marital property acquired after separation; and (2) whether wife is unfairly penalized if her marital share of husband's pension is calculated by utilizing husband's salary as of the date of marital separation, even though she will not collect her share, possibly, for years after separation.

As to the first question, the Divorce Code defines "marital property" as all property acquired during the marriage, with enumerated exceptions:

> (e) For purposes of this chapter only, "marital property" means all property acquired by either party during the marriage, including the increase in value prior to the date of final separation of any nonmarital property acquired pursuant to paragraphs (1) and (3) except:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (4) Property acquired after final separation until the date of divorce, except for property acquired in exchange for marital assets.

The Divorce Code of April 2, 1980, P.L. 63, No. 26, 23 P.S. § 401(e), as amended 1988, February 12, P.L. 66, No. 13. This provision is substantially reenacted at 23 Pa.C.S. § 3501(a), Act of Dec. 19, 1990, P.L. 1240, No. 206, § 2.

Thus, the Divorce Code excludes property acquired after the date of separation from consideration as marital property. The trial court's order, however, relies on increased contributions made after separation[6] as well as contributions made during the marriage.

It may seem at first consideration that the trial court's application of the coverture fraction (see note 5) to these increased contributions would prevent the post-separation (i.e., non-marital) increases from being distributed to wife. This,

6. Every year from 1984—1990 husband increased his contribution to the pension plan. Thus, in the years after separation (1984), he contributed more on an annual basis than he did during 1984. R. Rec. 268a.

however, is not correct, for although the pension benefit would be reduced by the coverture fraction, the reduction would be applied to a pension that was partially produced by increased post-separation contributions. This is prohibited by section 401(e), for property contributed to the retirement plan after separation is not marital property. We conclude, therefore, that the trial court's method of calculating wife's share of husband's pension benefits was in error.

The evil which the trial court was trying to avoid, of course, was awarding wife a marital share of the pension which she would not receive for years [7] and which would be dramatically diminished in value when she received it because of the time interval between being awarded a share of the pension and actually being paid that share.

Husband's proposal addresses this problem. Under his proposal wife receives 60% (her share of the marital property, including the pension) times the coverture fraction times the benefit at the determination date [8] of the retirement plan on the basis of husband's annual salary on July 31, 1984, the date of marital separation. Husband's benefit statement, dated December 31, 1984, provides in pertinent part:

YOUR CONTRIBUTIONS TO THE PLAN

| DURING 1984 | | ----TOTAL----- | |
|---|---|---|---|
| | | WITH INTEREST | WITHOUT INTEREST |
| $ 256.50 | BASIC | $ 840.60 | $ 777.96 |
| $1,796.25 | SUPPLEMENTAL | $26,283.43 | $18,250.75 |
| $2,052.75 | TOTAL | $27,124.03 | $19,028.71 |

Assuming that you continue at your present bene-
fit rate of pay and have no breaks in Credited

7. The parties do not dispute that the trial court properly employed the deferred distribution method, rather than the immediate offset method of dividing marital property, for there were insufficient assets in the estate to permit the husband to offset his interest in his pension by relinquishing a present interest in other marital property.

8. Under the husband's proposed QDRO, the wife's benefit determination date shall be the earliest of
   a. the Participant's separation from service;
   b. the Participant's death; or
   c. the date the Alternate Payee [wife] begins receiving her portion of the Benefit awarded to her hereunder.
   R. Rec. 272 a.

Service up to your normal Retirement Date of
July 1, 1997, your monthly pension will be

$ 826.02 UNDER THE BASIC PORTION AND
$2,773.22 UNDER THE SUPPLEMENTAL POR-
TION
$3,599.24 MAKING YOUR TOTAL PENSION EACH
MONTH

Thus, husband's employee benefit statement indicates that his monthly pension if he were to retire at the end of 1984, was $2,052.75; should he continue on until the age of 65 *at the same rate of pay,* his monthly retirement benefit would be $3,599.24, payable beginning July 1, 1997.

Under husband's proposal, if he were to work until age 65 and wife were to receive her share when husband retired,[9] wife's benefit would be calculated as follows: 350 months divided by 509 months (number of months husband contributed to the plan during marriage over total number of months husband was in the pension plan) times 60% (wife's marital share) times the accrued pension payable based on husband's July 31, 1984 salary, at age 65, subject to actuarial adjustments which may be necessary based on wife's age when she begins to receive her portion of husband's pension.

We cannot complete the math in this example because we do not know what husband's retirement benefit will be, even if it is based on his July, 1984 salary, since the plan's formula may change or there may be other non-employee factors affecting its value. If we assume, however, that *there were no other increases in benefits payable under the plan from sources other than husband's non-marital contributions,* wife's benefits would be calculated as follows:

**9.** Under the husband's proposed QDRO, wife's benefits begin:
9. Payments to the Alternate Payee will begin on the date selected by the Alternate Payee [see footnote 8] provided that such date cannot be earlier than the earliest date under the Plan that the Participant could have begun to receive benefits had he retired even if the Participant has not actually retired or separated from service with Westinghouse at that time or dies before then.
R. Rec. 276a.

1. The coverture fraction would be 350/509, or .68762.

2. Wife's marital share is 60%.

3. Husband's benefits payable at age 65, based on contributions based on his 1984 salary, paid until he reached 65, are $3,599.24/month.

4. Wife's benefits would be 350/509 (.68762) X .60 X $3,599.24, or $1,484.95/month, subject to actuarial adjustment.

Although wife may benefit from calculating the final pension based on the fiction that husband will continue to make the same post-separation contributions that he made at the time of separation, this does not award wife non-marital property, since *her share is reduced by the coverture fraction* multiplied by *the same salary husband made at separation*, but paid over years until he actually retires. The only purpose in creating the fiction that husband will make the same salary and pay the same contributions into the fund until normal retirement is that it gives wife the benefit of favorable changes in the benefits payable, if there are any, owing to factors not based on husband's increased contributions or efforts.

Thus, husband's proposal not only avoids awarding wife a share of non-marital property, but also allows wife to receive a marital share that is increased in value proportionate to the increase in value enjoyed by husband based on factors which have nothing to do with his increased contributions or effort. As husband puts it, his proposed orders

which do not even limit her to a share of $3,599.24, give the wife a share of all increases except increases which are based on post-separation pay raises and post-separation contributions.

Brief at 12. We believe that husband's assessment of his proposal is correct.

Accordingly, we hold that in a deferred distribution of a defined benefit pension, the spouse not participating may not be awarded any portion of the participant-spouse's retirement benefits which are based on post-separation salary increases,

incentive awards or years of service. Any retirement benefits awarded to the non-participant spouse must be based only on the participant-spouse's salary at the date of separation. However, should there be increases in retirement benefits payable to the employee spouse between the date of marital separation and the date the non-participant spouse begins receiving benefits which are not attributable to the efforts or contributions of the participant-spouse, any such increased benefits may be shared by the non-participant spouse based upon his or her proportionate share of the marital estate.

Affirmed. Remanded to the trial court for entry of a QDRO and Domestic Relations Order consistent with this opinion.

LARSEN, J., did not participate in the decision of this case.

CAPPY, J., files a dissenting opinion.

MONTEMURO, J., files a dissenting opinion.

CAPPY, Justice, dissenting.

For the reasons that follow, I am constrained to respectfully dissent.

The majority herein holds that,

in a deferred distribution of a defined benefit pension, the spouse not participating *may not be awarded* any portion of the participant-spouse's retirement benefits which are based on post-separation salary increases, incentive awards or years of service. Any retirement benefits awarded to the non-participant spouse must be based *only* on the partici-pant spouse's salary at the date of separation.

(Maj. op. at 402–403) (emphasis added).

Thereafter, in an apparent effort to reduce the harshness of the announced rule, the majority goes on to conclude that any

increases in retirement benefits payable to the employee spouse, between the date of marital separation and the date the non-participant spouse begins receiving benefits which are not attributable to the efforts or contributions of the participant-spouse, ... may be shared by the non-partici-

pant spouse based upon his or her proportionate share of the marital estate.

(Maj. op. at 403).

The majority correctly states that under the Divorce Code the marital portion of the pension is the benefit which the marital partnership acquired as of the date of separation.[1] The majority then concludes that the marital partnership has acquired as of the date of separation a benefit calculated by using the participant spouse's salary as of the date of separation and, furthermore, that a benefit calculated by using the participant's salary as of a later date (which the majority apparently assumes will be higher than at separation), will result in the non-participant spouse receiving more than what the marital partnership acquired prior to separation.

The majority's ruling would be correct if as of the date of separation the participant spouse had already acquired a final retirement benefit for the years worked during the marriage based on that spouse's date-of-separation salary and if all increased retirement benefits are deferred compensation for work performed after separation. However, neither is the case. The majority's ruling is based on three assumptions that I believe to be demonstrably incorrect. First, the majority assumes that, as of the date of separation, the participant spouse has acquired the right to receive, at the very minimum, a pension benefit calculated by using the participant's salary as of the date of separation; second, the majority assumes that an asset cannot be marital if it depends on any efforts or contributions made after separation; and third, the majority assumes that its result is fair because the non-participant spouse would otherwise receive benefits based upon earnings attributable to increased efforts and enhancement of job skills occurring after separation and therefore not attributable to the marriage.

1. Most pension plans calculate benefits by using an average salary earned over several years. The majority does not indicate whether the participant spouse's salary at the date of separation means an average salary based on earnings over several years prior to separation or whether the participant's salary at the date of separation means the actual salary as of the date of separation.

The majority is incorrect in assuming that a participant spouse has acquired the right to receive, at the very minimum, a pension benefit based on his salary as of the date of separation. To the contrary, the benefit that he will receive upon retirement will be calculated by using his salary during the final years of his employment. If his average salary during these years is less than his date-of-separation salary, his benefit will be less than a benefit based on his date-of-separation salary.

As of the date of separation, this was a vested pension. But the parties had acquired only a right to receive retirement benefits for the years that Mr. Berrington worked during the marriage that would be calculated primarily by looking to his salary shortly before he retired. As of the date of separation, the parties had not acquired any right to receive a specific amount of money for the years worked prior to separation. What they had acquired as of the date of separation was only a "promise" from the employer, an inchoate right if you will, to pay them benefits for the years worked during the marriage based upon a particular formula set forth in the pension plan contract[2] upon the occurrence of certain post-separation con-

2. Without resorting to expansive description of the Westinghouse pension plan involved in this case, the text of which comprises approximately 107 pages, generally the plan contract provides for the payment of benefits in three portions—Basic, Supplemental, and Executive. (1) Under the *Basic Portion*, an employee is entitled to benefits calculated under one of two methods, whichever is higher. Under the "career accumulation method" (earn a certain amount of pension each year), if one elects to contribute, he is entitled to a monthly pension benefit equal to $\frac{1}{12}$ of 1.3% of total compensation for that year up to $14,700 plus 2.4% of the remaining compensation for that year. If one does not contribute, the monthly career accumulation amount for each year of credited service is set forth in the contract. (e.g. $15 for each year of credited service after 1/1/83). Under the "final average compensation method," if one elects to contribute, he is entitled to a monthly pension benefit based upon the average pay during the 3 highest paid consecutive years in the 10 years before retirement, which yields a monthly pension benefit for each year of credited service pursuant to a table set forth in the plan. (2) Under the *Supplemental Portion*, contributions are made based upon the amount of the employee's salary (by my estimate approximately 1.25% of his base salary). Under this portion an employee accumulates an amount of pension each year, and an employee is entitled to benefits based upon his years of credited service multiplied by his earning class multiplied by $1.05 for years prior to

tingencies.[3]  The final benefit for the years worked during the parties' marriage will be calculated by considering Mr. Berrington's subsequent earnings and incentive awards during his continued years of service.  It is this promise acquired during the marriage to pay benefits for the years worked during the marriage that the majority fails to recognize as being earned during the marriage, and thus, improperly labels as "after-acquired property."  Under the employer's promise, the participant spouse's salary at the date of separation is not determinative of the amount that he or she will receive upon retirement.  Thus, in valuing the pension benefit, the participant spouse acquires *during the marriage, a promise to make deferred compensation* for the marriage years based upon a formula that could produce pension benefits higher *or lower* than the amount that would be arrived at based upon earnings at the date of separation.

Under these circumstances, it is clear that the inequity resulting from the majority's approach can cut both ways. The general assumption may be that the participant spouse's salary will increase after the date of separation, resulting in his becoming entitled to a correspondingly larger pension upon retirement.  However, in a downward economy, as some might say we have endured over the past few years, it is wholly within the realm of reasonable possibility that economic cut-backs will force employees to take income cuts, resulting in substantially lower salaries at retirement.  In those instanc-

1970, and a dollar value set forth in plan schedules for years after 1969. (e.g. One in earnings class 10—earning between $975 and $1025 a month would have made a monthly contribution of $12.50 in the years after 1969).  (3) Under the *Executive Portion*, an employee makes no contributions, and he earns a final pension benefit based upon his average total compensation multiplied by his years of service multiplied by 1.47%.  "Average total compensation" is comprised of his "average monthly salary" and "average monthly incentives" computed based upon the best 5 months in the last ten years before retirement.

3.   See *David v. Veitscher Magnesitwerke Actien Gesellschaft*, 348 Pa. 335, 35 A.2d 346 (1944), wherein this Court recognized that such a "promise" by the employer conveys upon the employee an "inchoate right." It is this right, and its associated detriment, that I believe is in essence, a joint enterprise undertaken by husband and wife that accrued during the marriage.  See also *Moore v. Moore*, 114 N.J. 147, 553 A.2d 20 (1989).

es, it is the participating spouse who suffers under the legal fiction created by the majority.[4]

The majority's second assumption—that an asset cannot be considered marital if its value depends upon any efforts or contributions made after the date of separation—is inconsistent with the prevailing view that *non-vested* pension benefits are marital property regardless of the fact that they are subject to contingencies. It is clear from even a cursory reading of the majority opinion that the majority recognizes that both vested and *non-vested* pension plans are marital property subject to equitable distribution.[5] In *Braderman v. Braderman,* 339 Pa.Super. 185, 488 A.2d 613 (1985), the rationale was succinctly set forth: "These benefits constitute deferred compensation for services defendant-husband per-

4. Let us suppose that for each year of employment the pension plan provides that the employer pays 2 percent of the average of the last ten years, as determined by the best last five months of each year. At the date of separation, the participating spouse is 55 years of age and is earning $60,000. That spouse works ten more years until age 65 in a declining economy where the economic performance of the company suffers a substantial decline. Let us finally suppose that because of the company's poor performance and poor financial situation, the salary of the participating spouse on average has fallen to $40,000 at retirement. Assuming 20 years of marriage at the date of separation and 30 years of employment at the date of retirement, the majority herein would assign marital benefits to the non-participating spouse in the amount of ⅔ (coverture fraction) of 30 (the years of participation in the pension plan), times $60,000 (the salary at separation), even though the actual deferred pension payment for the participating spouse turns out to be based upon $40,000 (the actual average salary over the last 10 years of employment). Can the majority reasonably conclude that the participating spouse had earned the right to a pension based upon $60,000 for the first 20 years of marriage? In fact, he or she had actually earned a 30–year pension based upon a salary of $40,000. The simple fact is that the participating spouse did *not* earn a pension based upon a salary of $60,000 and no legal fiction to the contrary can absolve the inequity.

5. *Verdile v. Verdile,* 370 Pa.Super. 475, 536 A.2d 1364 (1988); *Vaughn v. Vaughn,* 370 Pa.Super. 333, 536 A.2d 431 (1988); *Major v. Major,* 359 Pa.Super. 344, 518 A.2d 1267 (1986); *Braderman v. Braderman,* 339 Pa.Super. 185, 488 A.2d 613 (1985); *Barnhart v. Barnhart,* 343 Pa.Super. 234, 494 A.2d 443 (1985); *Flynn v. Flynn,* 341 Pa.Super. 76, 491 A.2d 156 (1985); and *King v. King,* 332 Pa.Super. 526, 481 A.2d 913 (1984). See also; *Whitfield v. Whitfield,* 222 N.J.Super. 36, 535 A.2d 986 (1987) (recognizing the long term movement of the vast majority of other jurisdictions away from invoking vesting as a requirement to the distribution of pension benefits).

formed during the marriage and therefore, he acquired his interest in these benefits while married to plaintiff-wife ... He worked for and earned the right to these payments." *Id.* at 196, 488 A.2d at 618. The Superior Court concluded that pension benefits are marital property even though the marriage terminated at a time when benefits were *non-vested,* despite its recognition of the fact that non-vested benefits are subject to a number of contingencies: "These benefits have accrued, but are still subject to the condition that the employee continue his employment. They will be forfeited by discharge, voluntary termination, or death." *Id.* at 192, 488 A.2d at 616.

In concluding that *non-vested* pension benefits are nothing more than deferred compensation and thus, marital property (i.e., marital property is the promise to pay for the time that you have already worked provided that certain things occur), the Superior Court has created a foundation on which to build a fair and equitable resolution in the case *sub judice.* Once this promise is defined as marital property, there can be no reasonable explanation for ignoring future events that define the benefits which flow from the promise. The persuasive and well-reasoned rationale utilized by the Superior Court for finding *non-vested* pension benefits to be marital property is equally applicable to the issue presented here.

Third, the majority errs when it concludes that its result is fair because the non-participant spouse would otherwise receive benefits based on increased efforts and enhancement of job skills occurring after separation and therefore not attributable to the marriage. The majority implicitly assumes that the post-marital salary increases of the participant spouse result from the participant spouse bringing new energy and skills to the job. However, the typical case in which the court awards a non-participant spouse a share of a defined benefit pension does not involve persons in their twenties or thirties who have been married only for a short time. Rather, experience teaches that, in the typical situation, the time and energy that participant spouse devoted to the job during the marriage and the work skills developed during that period (frequently

made possible because of the contributions of the non-participant as homemakers and primary caretakers of the children), rather than increased efforts or work skills developed after marriage, are the most significant factors explaining increased post-marital earnings in cases involving the use of a deferred distribution of a defined benefit pension.

Since the Divorce Code has given the Courts the responsibility for achieving equitable results, 23 Pa.C.S. § 3102(a)(6) (formerly 23 P.S. § 102(a)(6)) and 23 Pa.C.S. § 3502 (formerly 23 P.S. § 401), the law that we develop must be governed by the import of our rulings. In most cases involving the use of a deferred distribution of a deferred pension benefit, the non-participant spouse will be the primary homemaker and caretaker of the parties' children. This spouse will also in most cases be the wife. In accordance with 23 Pa.C.S. § 3502(a)(7) (formerly 42 P.S. § 401), the most important thread that consistently runs through the rulings of this Court and the Superior Court involving the Pennsylvania Divorce Code is the full recognition given to homemaking and caretaking. Since pension benefits are frequently the most significant marital asset in instances in which a deferred pension distribution approach is used, the majority ruling here unravels the standing case law which has achieved very consistent and, in my view, very correct results.

To summarize, the paramount difficulty I have with the majority's position is understanding how, in a deferred compensation situation, the majority can characterize the participant spouse's post-separation salary as after-acquired property rather than as an unknown factor that will be used in calculating the value of deferred compensation earned during the marriage. A *promise to pay* an amount based upon a formula that may be influenced by efforts after separation is "property" acquired at the time of the promise under a normal definition of the term.

Constructive criticism, well intended as it may be, is often useless unless accompanied by a reasonable alternative. Although I agree with the majority that marital property includes only property acquired during the marriage, it is my

position that, where the property in question is deferred compensation, the property acquired during the marriage includes those benefits that the participant and non-participant spouse will actually receive for the years during which the parties were married. In my view, at the time of the parties' separation, a participant spouse has acquired a *promise* from the employer to make deferred compensation payments (for the years of the marriage) based upon a formula that can produce *higher or lower* pension benefits than those calculated based upon the employee's earnings at the date of separation. Thus, the marital property acquired during the marriage includes this promise to make future payments for the years worked during the marriage. Therefore, I propose that we follow the deferred distribution approach utilized in cases involving non-vested pension benefits.

As recognized by the majority, there are two approaches to distributing a pension, the immediate offset method and the deferred distribution method. The immediate offset method provides the advantage of finality in distribution, and avoids prolonging hostility between the parties. However, deferred distribution is often necessary because other marital assets may be insufficient to offset a pension award.[6] Moreover, the Superior Court has stated in numerous opinions that *deferred distribution* is the preferred method of dividing *non-vested* speculative pension benefits, which may never actually be received by the employee spouse due to contingencies such as

---

**6.** Obviously, the demand for final resolution and valuation is paramount where the trial judge is required to set-off the value of pension benefits as against other marital assets in determining a final order of equitable distribution. However, that is not the case here. Set-off is not an issue in this appeal and the question of how to place an immediate value on future benefits can be left to another day. I, for one, see many approaches, including, but not limited to, valuing at the date of normal expected retirement *absent* evidence that some other date would be more appropriate. In that situation, I would agree that because the parties are demanding an immediate set off, the compromise of utilizing the final salary as of the date of separation may be the only available alternative. However, no such demand is made in the case *sub judice* and, therefore, there is no need to resort to a legal fiction in order to resolve the issues. Nor is the issue raised in the companion case of *Katzenberger v. Katzenberger*, 534 Pa. 419, 633 A.2d 602 (1993), also decided this day by this Court.

early termination or death. *Elhajj v. Elhajj*, 413 Pa.Super. 578, 581, 605 A.2d 1268, 1270 (1992); *Lyons v. Lyons*, 401 Pa.Super. 271, 280, 585 A.2d 42, 47 (1991); *Lowry v. Lowry*, 375 Pa.Super. 382, 401, 544 A.2d 972, 982 (1988); *DeMasi v. DeMasi*, 366 Pa.Super. 19, 50, 530 A.2d 871, 886 (1987); *Flynn v. Flynn*, 341 Pa.Super. 76, 83, 491 A.2d 156, 160 (1985). Valuation difficulties and the potential unfairness of immediate distribution of pension benefits that may never come to fruition, or decline due to salary reductions in the later years as a result of today's economy, also weigh in favor of using the deferred distribution approach.[7]

In my view, once deferred distribution is chosen, there is a glaring inconsistency in caselaw which favors a "wait and see approach" where it is not clear whether employees will, in fact, receive any benefits at all and, at the same time abandons that approach in a deferred distribution scenario where the "wait and see approach" would remove all doubt as to the exact entitlement of the respective parties. Why should we not adopt exactly the same posture in a situation where the pension is vested but the benefits are, as yet, unmatured and undetermined, where the parties are in a deferred distribution posture?

In *Lyons v. Lyons*, 401 Pa.Super. 271, 585 A.2d 42 (1991), the Superior Court has emphasized that the method to be selected for evaluating pension benefits is that which will "best effectuate economic justice between the parties." *Id.* at 281, 585 A.2d at 47. I agree with that court and the learned trial court below, that the real issue is one of economic justice, especially in light of the fact that the law is sensible and settled that pension benefits are marital property even though there are future requirements imposed on employees before benefits are ever received. It is incomprehensible to me as to why we should reach different results depending upon whether the question with which we are dealing involves deferred compensation (i.e., marital property defined as a promise to

7. See *In re Marriage of Fairchild*, 110 Ill.App.3d 470, 475, 66 Ill.Dec. 131, 134, 442 N.E.2d 557, 560 (1982) (quoted in *Flynn, supra.*); see generally *Moore v. Moore*, 114 N.J. 147, 553 A.2d 20 (1989).

pay for the time that you have already worked, provided that certain things occur which would cause the pension to vest) or deferred compensation (i.e., marital property defined as a promise to pay for the time that you have already worked, provided that the amount to be paid to you will be determined when all the final numbers are in).

In an ill-advised effort to resolve all future interest immediately, my brethren in the majority have been thrust into the uncomfortable position of immediate resolution with full knowledge that the consequences will more often than not be unfair to one or the other party.[8] In addition, the majority has done so without attempting to explain the pressing need for the immediate valuation of the non-participant spouse's pension interest in a case involving the deferred distribution of a defined pension benefit.[9]

In the case *sub judice*, in accordance with the pension plan, Mr. Berrington made a small mandatory cash contribution after the date of separation. While his pension will ultimately be of higher value due to his decision to contribute and Westinghouse's incentive in return for his contributions, such contributions were specifically defined, and their minimal na-

8. *Elhajj v. Elhajj*, 413 Pa.Super. 578, 605 A.2d 1268 (1992); *Holland v. Holland*, 403 Pa.Super. 116, 588 A.2d 58 (1991), *allocatur denied*, 528 Pa. 611, 596 A.2d 158 (1991); *LaBuda v. LaBuda*, 349 Pa.Super. 524, 503 A.2d 971 (1986), *allocatur denied*, 514 Pa. 648, 524 A.2d 494 (1987); *Flynn v. Flynn*, 341 Pa.Super. 76, 491 A.2d 156 (1985); *King v. King*, 332 Pa.Super. 526, 481 A.2d 913 (1984); *Morschhauser v. Morschhauser*, 357 Pa.Super. 339, 516 A.2d 10 (1986); *Moore v. Moore*, 114 N.J. 147, 553 A.2d 20 (1989) (Right to receive benefits accruing to a spouse *subsequent* to a divorce are subject to equitable distribution if they are related to the joint efforts of the parties); *Whitfield v. Whitfield*, 222 N.J.Super. 36, 535 A.2d 986 (1987); *Majauskas v. Majauskas*, 61 N.Y.2d 481, 463 N.E.2d 15 (1984) (Conclusion thus reached accords with that of most out-of-state courts); *Jerry L.C. v. Lucille H.C.*, 448 A.2d 223 (Del., 1982); *Lynch v. Lynch*, 665 S.W.2d 20 (Mo.Ct.App., 1984); *In re Marriage of Judd*, 68 Cal.App.3d 515, 137 Cal.Rptr. 318 (1977).

9. This situation is analogous to one in which the employer agrees to contribute 2 percent of husband's salary into the company stock for each year the husband works, with the husband to receive the current value of the stock when he reaches age 65. In such a case, the increase in value after the date of separation for stock purchased before separation would clearly be marital property.

ture (approximately $13,700 from the date of separation on July 15, 1984 through the year 1990) will have little effect in the generation of the final value of his pension benefit. (R.R. pp. 99a, 268a).[10] Instead, it is his continued employment and the potential salary increases and incentive awards that will determine the final value of his pension. A posture that, in my strong opinion, Mr. Berrington achieved with the substantial aid and sacrifice of Mrs. Berrington during their 29 years of marriage.[11] In my view, most of the pension benefit is not

**10.** While I acknowledge that Mr. Berrington has undoubtedly continued to make contributions after 1990, further evidence of the limited effect of such contributions on the final value of the pension is provided by the fact that during the period between his commencement of employment in 1955 through the year 1987, Mr. Berrington's contributions amounted to only $25,694.71. As of July 13, 1988, these contributions had only earned interest in the amount of $12,693.14. (R.R. p. 99a). Moreover, Mr. Berrington has made no contributions whatsoever to the separate "non-qualified" Executive Portion of the Westinghouse Pension Plan.

The majority appears to have used this "small cash contribution" as the foundation on which to hold that pension benefits must be based upon the husband's salary at separation, even where no contributions were made to the separate "non-qualified" Executive Portion of the Westinghouse Pension Plan. The Court reached the result without explanation and simply by stating that marital property acquired during the marriage does not include pension benefits purchased with contributions made after separation. The Superior Court then cites to *Berrington* in order to justify its holding in *Katzenberger v. Katzenberger*, 409 Pa.Super. 10, 597 A.2d 636 (1991), the companion case also decided this day by this Court, 534 Pa. 419, 633 A.2d 602 (1993). However, in *Katzenberger* the final pension benefits are *not* based upon any contributions that husband made after separation, whereas here, much of the majority opinion appears to be based on husband's cash contributions made after separation, although in part of the opinion the majority refers to the "efforts" of the husband/participant spouse.

In my view, the majority approach is illogical in that it has placed the proverbial cart before the horse. We should have started with *Katzenberger* in which the pension benefits are *not* based upon any contributions made by husband after separation. Then the sole issue would have been what salary figure is appropriate for final computation of wife's equitable share. Furthermore, the wife's benefits should be based on the husband's salary as utilized by the employer in the final computation under the specific pension plan being used. For the reasons stated, I do not agree that the husband's salary at separation is determinative of wife's equitable share.

**11.** In 1955, at age 20, Claire L. Berrington resigned from college in order to marry and support Charles L. Berrington in his new career

based upon an employee cash contribution made after separation.

Therefore, and for the reasons stated above, I would reverse and remand to the trial court with instructions to separate out any benefits attributable to the husband's actual post-separation cash contributions. The balance would be available for distribution to the wife under the proper equitable distribution formula at the appropriate time, the date of retirement.

The approach I have suggested in the case *sub judice* not only recognizes that there is no need for immediate valuation but also best effectuates economic justice between the parties. Additionally, it would obviate the need to create legal fictions in order to resolve immediately that which need not be resolved immediately and, better yet, totally eliminate the need to create an internally inconsistent fabrication which offers the non-participating spouse concomitant benefit increases in all areas which are not directly tied to salary increases.

For these reasons, I respectfully dissent.

MONTEMURO, Justice, dissenting.

Before the majority decided the instant case, there were two distinct and well-defined methods of distributing a defined benefit pension plan; immediate offset and deferred distribution. Here, the majority departs from these two discrete methodologies by adopting a deferred distribution scheme which is an amalgamation of immediate offset and defined distribution concepts. Because this distribution is premised on a questionable valuation mechanism, which consequently fails to compensate the non-employee spouse for waiting to

with the Westinghouse Electric Corporation. During the course of the next 29 years, Mrs. Berrington provided Mr. Berrington with two sons, and faithfully and energetically devoted herself to her family and her husband's career, including household relocation on eleven occasions, six of which were of an interstate nature. In July 1984, Mr. Berrington, by my estimate approximately 52 years of age, left Mrs. Berrington to reside with a woman 12 years his junior. Mr. Berrington filed for divorce less than six months later, and remarried in October 1987.

receive her portion of the pension benefit, I cannot join the majority's opinion.

To grasp the flaw in the majority's reasoning, it is necessary to first understand how a defined benefit pension plan is funded, and then how such a plan should be evaluated for the purpose of equitable distribution. A defined benefit pension plan is a "form of deferred compensation [which is based on] a written plan established and maintained by an employer." 3 W. Cantwell, W. Troyan, & H. Massler, *Valuation & Distribution of Marital Property* 45–10, 45–26 (1990) [hereinafter *Valuation & Distribution*]. M. Canan, *Qualified Retirement and Other Employee Benefit Plans* 133 (1989) [hereinafter Canan]. This type of pension is commonly funded via the accrued benefits method, or the projected benefits method. *Valuation & Distribution, supra,* at 45–26—27. If the accrued benefits method is used, the plan develops a set of actuarial assumptions for each employee, and then, based on these assumptions, determines the cost of that employee's benefit for the year. *Id.* Under the projected benefits method, cost is not determined on a per employee basis, rather cost is determined on an aggregate basis for all employees. *Id.* However, no matter which funding method is employed, the plan starts with the conclusion, the amount the participant is entitled to receive at retirement under the terms of the plan, and works backward to the premise, that is, what amount the employer must set aside now to fund the future obligation. Canan, *supra,* at 134. This should assure that upon retirement, the retiree will receive the promised benefit.

Although an employer may fund the total cost of a defined benefit plan, such a plan "may provide for both required and voluntary contributions by the plan's participants." Canan, *supra,* at 142. This method of funding reduces the overall cost to the employer. However, the benefit available to the participant at retirement is still determined via a predefined formula which is set down in the written plan.

A problem arises when an individual, who is covered under a defined benefit pension plan, divorces before retirement. When this occurs, courts attempt to do economic justice

between the parties by equitably distributing the marital portion of the pension. Two methods have historically been used to effect economic justice between the parties; immediate offset and deferred distribution. With an immediate offset, the present value of the employee spouse's defined benefit pension plan is determined at the time of the distribution hearing. *King v. King,* 332 Pa.Super. 526, 534, 481 A.2d 913, 917 (1984). *See, Sutliff v. Sutliff,* 518 Pa. 378, 381–2, 543 A.2d 534, 536 (1988) (property must be distributed with reference to its value at the date of distribution). The present value is calculated based on the following factors: the employee spouse's salary at the time of separation; the date the employee will begin to receive the benefit or has a right to receive the benefit; the length of the employee's employment during marriage; the total length of the employees' employment; and, the appropriate mortality and interest discount rates. *Evaluation and Distribution, supra,* at chap. 45; *Elhajj v. Elhajj,* 413 Pa.Super. 578, 581, 605 A.2d 1268, 1270 (1992). Once the present value of the marital portion of the benefit is determined, the court looks to whether there are sufficient marital assets to allow the employee spouse to retain full enjoyment of the pension, while giving to the non-employee spouse an offsetting portion of the other marital assets. Although immediate offset is preferred because it draws to a close the economic relationship between the parties, there are circumstances that preclude use of this methodology. W. Troyan, *Pension Evaluation and Equitable Distribution,* 10 Fam.L.Rep. (BNA) No. 4, Monograph No. 1, p. 3006 (November 22, 1983) [hereinafter Troyan]. For example, immediate offset is inappropriate when the pension has not vested, *Lyons v. Lyons,* 401 Pa.Super. 271, 280, 585 A.2d 42, 47 (1991), or when there are insufficient marital assets to effectuate the setoff, *Elhajj,* 413 Pa.Super. at 581, 605 A.2d at 1270; *King,* 332 Pa.Super. at 534; 481 A.2d at 917; Troyan, *supra,* at 3006. Under both situations, distribution must be deferred until the employee spouse's right to receive the benefit matures. *Lyons,* 401 Pa.Super. at 280, 585 A.2d at 47; Troyan, *supra,* at 3006.

If circumstance dictates that distribution be deferred, "a simple formula is devised which makes possible the future division of benefits pursuant to an allocation formula [set down] at the time of divorce." *Valuation and Distribution, supra,* at 45–60. This formula is simple because there are *no* present value calculations to be done, nor should any such calculations be made. *Id.;* Troyan, *supra,* at 3007; *Elhajj,* 413 Pa.Super. at 581, 605 A.2d at 1270; *Endy v. Endy,* 412 Pa.Super. 398, 403, 603 A.2d 641, 643 (1992). Rather, the coverture fraction[1] is determined so that the portion of the pension benefit earned during marriage may be calculated. Once the fraction is determined, it is multiplied by the actual benefit available when the pension enters pay status. This simplistic method both attains economic justice, 23 Pa.C.S.A. § 3102(a)(6), and complies with the mandate of the Divorce Code that only marital property is subject to equitable distribution, 23 Pa.C.S.A. §§ 3501 and 3502, because the coverture fraction separates the marital from the non-marital portion of the benefit. Therefore, with the passage of time, "the non-employee spouse will receive a decreasing percentage of an increasing benefit." *Troyan, supra,* at 3007.

Here, the majority has placed its imprimatur on a valuation scheme that allows for future distribution of the present value of a defined benefit pension plan. This freezes the non-employee spouse's share of the pension benefit at its date-of-separation value. Thus, when the benefit enters pay status, the non-employee spouse will begin to receive a benefit which has decreased in value through the passage of time. The majority attempts to compensate the non-employee spouse for the loss of the time value of money by allowing her to share in "increases in retirement benefits ... which are not attributable to the efforts or contributions of the participant spouse." (Maj. op. at 403). However, with a defined benefit pension,

---

**1.** The coverture fraction represents the portion of the benefit which was earned during marriage. "The numerator of the fraction is the total period of time the employee spouse was [a] participant in the plan from date of marriage until date of separation, and the denominator is the total period of participation in the plan." *King,* 332 Pa.Super. at 533, 481 A.2d at 916.

such increases are nonexistent as the benefit is predefined under the terms of the plan. Thus, the non-employee spouse will not receive an equitable share of the pension benefit.[2] Accordingly, I believe that the majority erred when it departed from the deferred distribution formula advanced by the commentators, *See, Valuation and Distribution, supra,* at 45–60, Troyan, *supra,* at 3006–7, and ordered the deferred distribution of the present value of a defined benefit pension plan.[3]

In addition, a departure from the traditional deferred distribution methodology is not necessitated merely because the instant plan is funded by contributions from both the employer and employee. The fact remains that this plan is a defined benefit plan. Thus, the method of funding should not affect the manner in which a deferred distribution is accomplished. However, if the instant plan was a defined contribution plan, rather than a defined benefit plan, it would be appropriate to determine the present value of the employee spouse's contributions to the plan. Once a present value determination is made, which is the balance in the employee spouse's contribution account as of the date of separation, the marital portion of the account (i.e. the coverture fraction) is calculated, and then equitably distributed between the parties. If distribution of this sum is to be deferred, the plan must place the non-employee spouse's share of the pension into a separate account where it will remain until the non-employee spouse's right to the benefit matures. During this period, any interest or dividends earned by the account accrue only to the non-employee spouse's benefit.

2. After ordering the deferred distribution of the present value of a defined benefit plan, the majority then requires that this amount be further reduced by the coverture fraction. Because the coverture fraction was used to calculate the present value of the benefit, it defies logic to use the fraction to further reduce the benefit when it enters pay status.

3. If the majority truly aspires to do economic justice between the parties under the instant distribution scheme, they could award the non-employee spouse the present value of the benefit plus a reasonable rate of return on this sum from the date of valuation to the date the pension enters pay status. Although I do not advocate the adoption of this approach to deferred distribution, such a scheme is more equitable than the one adopted here.

In sum, if the non-employee spouse is entitled to a pension benefit based on the employee spouse's salary at separation, the benefit should not be further reduced by the coverture fraction. To freeze the salary, and also bar the spouse from sharing in post-separation increases to the benefit, which arise solely from the time value of money, works an injustice to the non-working spouse. Thus, I cannot join the majority's opinion. Accordingly, I respectfully dissent.