938 A.2d 246

**F. Andrew SMITH, Appellee**

**v.**

**Therese A. SMITH, now Therese A. Boulding, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 4, 2006.

Decided Dec. 27, 2007.

82

Timothy John Shultis, Miller & Shultis, P.C., Hanover, for Therese A. Smith, appellant.

Lynn Gilbert Peterson, Peterson & Peterson, Hanover, for F. Andrew Smith, appellee.

BEFORE: CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

Justice BAER.

Over the past two decades, this Court has divided repeatedly with respect to the proper method for equitably distributing defined benefit pensions between employee and non-employee spouses. Faced once again with determining what portion of a pension, including any postseparation increase in the pension, is marital property subject to equitable division, we

revisit the divergent policies expressed in our prior cases and examine the legislature's response in amending the Divorce Code's definition of marital property to address defined benefit pensions. *See* 23 Pa.C.S. § 3501(c)(1). After considering the legislative intent, we conclude that a large portion of the increase in the pension benefit in this case did not arise "from postseparation monetary contributions made by the employee spouse," *see id.*, but instead resulted solely from the legislature's creation of a new class of pension benefits. Therefore, we hold that the portion of the increase resulting from legislative action constitutes marital property subject to equitable distribution. Contrarily, we find that a small portion of pension did result from postseperation monetary contributions made by the employee spouse, and that this portion should be characterized as nonmarital. We reverse the decision of the Superior Court to the extent it is contrary herewith, and remand to the trial court for implementation.

F. Andrew Smith ("Husband") and Therese A. Smith ("Wife") were married in August 1974 and separated in January 1995. Before, during, and after the marriage, Husband was employed by the Commonwealth of Pennsylvania in the Department of Corrections, accruing pension benefits through the Pennsylvania State Employees Retirement System ("SERS"), as established pursuant to the State Employees' Retirement Code, 71 Pa.C.S. § 5101 *et seq.*[1] In September 1997, a master valued Husband's pension at approximately $277,610. The master found that Wife was entitled to approximately 50% of the pension, but reduced the total value of her share to account for the award to Wife of other assets.

Both parties filed exceptions to the master's report. Following the April 1998 entry of a divorce decree, the trial court addressed the parties' exceptions and, in July 1998, ordered them to implement the distribution scheme set forth in the court's opinion, which in relevant part provided:

1. Husband began his employment with the Commonwealth in December 1971.

Thus, because marital property includes interest increases on the marital portion of a pension, the stipulated value of Husband's pension at $277,609.52 must be increased by the appropriate interest amount. Wife is awarded 49.62301 percent of the pension or $137,758.20, as set forth more fully below. The parties are to submit to the Court a Qualified Domestic Relations Order developed by a CPA providing that Wife receive 49.62301 percent of Husband's pension, including the 4 percent interest compounded annually attributable thereto, as of the date of separation.[2]

Tr. Ct. Op., 7/20/1998, at 6. For reasons unrelated to the issues on appeal, the parties were unable to agree upon a Qualified Domestic Relations Order ("QDRO"),[3] despite being ordered a second time to file the document following the resolution of other equitable distribution issues in October 1998.

Before the parties could agree upon and file a QDRO, the General Assembly enacted Act 2001-9 in May 2001 to address a surplus in SERS by creating new classes of membership with increased benefits: "The increase in benefits for State and school employees provided herein will in effect allow them for the first time to share in the outstanding investment performance of the funds. To date, that experience has only benefited the employers through reduced contributions to the funds." Act of May 17, 2001, P.L. 26, No. 9. Under Act 2001-9, Husband, who was previously a "Class A member,"

2. We note that the trial court and the master exhibited extreme precision in calculating the amounts and percentages in this equitable distribution case. Such precision is not necessary to attain economic justice between the spouses. 23 Pa.C.S. § 3102(a)(6) (providing that it is the policy of the Commonwealth to "[e]ffectuate economic justice between parties"). Economic justice usually can be accomplished by rounding the value of the assets and relevant percentage points. Thus, while we do not criticize the trial court, we emphasize that dividing the marital estate with mathematical precision is unnecessary.

3. A QDRO is an order "which creates or recognizes the rights of an alternate payee to receive all or a portion of the benefits payable to a participant under the plan. To be 'qualified,' the order must contain certain required information and may not alter the amount or form of plan benefits." *Berrington v. Berrington*, 534 Pa. 393, 633 A.2d 589, 591 n. 3 (1993) (citation omitted). The actual qualifying of the domestic relations order is done by the employer's pension administrator.

could elect to transfer to the new "Class AA" with a potential 25% increase in his entire pension effective July 1, 2001.

> Provided that an election to become a Class AA member is made pursuant to section 5306.1 (relating to election to become a Class AA member), a State employee . . . who on June 30, 2001, and July 1, 2001, is . . . a member of Class A . . . shall be classified as a Class AA member and receive credit for Class AA State service performed after June 30, 2001, *upon payment of regular member contributions for Class AA service*[,] and . . . shall receive Class AA service credit for all Class A State service . . . performed before July 1, 2001.

71 Pa.C.S. § 5306(a.1)(3) (emphasis added). The election resulted in a change in the "class of service multiplier" from 1 to 1.25. 71 Pa.C.S. § 5101 ("Class of Service Multiplier"). The change in the class of service multiplier in turn caused an increase from 2 to 2.5 in the multiplier used by SERS for calculating Husband's pension benefits (hereinafter "SERS multiplier").[4] Notes of Testimony ("N.T."), 5/27/04, at 17 (Testimony of SERS representative). The General Assembly conditioned the prospective increase in benefits only for service after June 30, 2001 on increased member contributions in pay periods after January 2002. 71 Pa.C.S. § 5306(a.1)(3), Act No. 2001–9 § 1(4) ("Participation in the enhanced benefit accrual rate should not be mandatory for current members. Members who elect to participate should have to agree, as provided herein, to increase employee contributions as consideration for their future receipt of enhanced benefits after the termination of service."). Accordingly, while the increase in the SERS multiplier from 2 to 2.5 became effective as of July 2001, the increase in the contribution rate from 5% to 6.25% applied to pay received as of January 2002. N.T., 5/27/04, at 17–20.

---

**4.** The SERS website describes its plan as a "contributory defined benefit plan," and provides the following formula for calculation of retirement benefits: 2% × Class of Service Multiplier × years of credited service × final average salary = maximum annual retirement allowance. *See* http://www.sers.state.pa.us/sers/cwp/view.asp?a=236&q=264148 (last reviewed 10/22/07).

To elect to become a Class AA member, an employee was required to file written notice with the State Employees' Retirement Board before January 1, 2002, or before the member terminated service, whichever occurred first. 71 Pa.C.S. § 5306.1(b). The election would then be effective on the "later of July 1, 2001, or the date when the election is filed with the board." *Id.* § 5306.1(c). On June 18, 2001, Husband elected Class AA status, effective July 1, 2001.[5] On the same day, Wife filed a petition for special relief regarding the parties' inability to agree upon a QDRO. After Husband filed an answer, Wife sought a continuance, which was granted.

Prior to any hearing on the QDRO and apparently without notice to Wife, Husband retired in July 2002. As of his retirement, Husband had paid the increased contribution rate for approximately seven months. When he retired, Husband's pension entered pay status and Husband chose Option 1 with Option 4. As explained in Husband's SERS Statement of Account, Option 1 "provides reduced monthly benefits to [the employee] for life. All monthly benefits are reduced from the Present Value. Any balance remaining at [his] death will be paid to [his] beneficiary(ies)." SERS Statement of Account, Plaintiff Exhibit A, 5/7/04 Hearing. Under Option 4, an employee "may receive all or a portion of [the] accumulated deductions (contributions or interest) in a lump sum or install-ment payments and receive reduced monthly benefits under one of the other retirement options. Option 4 is available only at the time of retirement and may not exceed [the] accumulat-ed deductions." According to the testimony of the SERS representative, Husband made a lump sum withdrawal in September 2002 of $84,805, and collects a monthly benefit from SERS of $3937. N.T., 5/27/04, at 10–11. Husband testified that he rolled the lump sum into an individual retire-ment account ("IRA"). N.T., 5/27/04, at 61.

5. The Class AA election form provided: "I elect to become a member of Class AA effective July 1, 2001 pursuant to all conditions contained in Act 2001-9. I understand my contribution rate will increase to 6.25% effective with my first pay in January 2002. I understand that my election is final and binding." Class AA Election, Plaintiff Exhibit B, 5/27/04 hearing.

In May 2003, Wife again sought a hearing on the QDRO issue and Husband's retirement. In pre-hearing briefing, the parties disputed whether the increase in the multiplier following Husband's election of Class AA status constituted marital property subject to equitable distribution under the rule this Court announced in *Berrington v. Berrington*, 534 Pa. 393, 633 A.2d 589 (1993). In that case, as discussed in detail below, the Court held that the employee-spouse's pension should be calculated based on the salary at the time of separation and the non-employee-spouse may only be awarded postseparation increases in pension benefits that are not attributable to postseparation efforts and contributions of the employee-spouse.[6] Accordingly, Wife contended that the increase due to the election of Class AA was the result of a legislative act and not due to any postseparation efforts or contributions of Husband. Wife rejected Husband's argument that the act of election or the mere seven months of increased contributions prior to his retirement in July 2002 justified a determination that the dramatic increase in the total pension was due to those efforts or contributions. Citing a December 16, 2003 letter from legal counsel at SERS, Wife noted that SERS calculated the present value of the pension for the period between the date of marriage in August 1974 and the date of separation in January 1995 as $402,890. After applying her percentage of equitable distribution as originally designated by the trial court and the coverture fraction,[7] Petitioner notes that SERS indicated that the figures would result in a monthly payment to Wife of $1102 per month until she received $199,926. SERS Letter of 12/16/03, 1, Defendant Exhibit C, 5/27/04 hearing.[8]

6. As discussed in detail below, the legislative enactment of 23 Pa.C.S. § 3501(c) was intended to "reverse" this Court's decision in *Berrington*.

7. The denominator of the coverture fraction is the number of months the employee spouse worked to earn the pension benefit and the numerator is the number of such months accrued during the marriage prior to final separation. *See* 23 Pa.C.S. § 3501(c).

8. Both parties also contested the details of the application and payment of their proposed valuation of the marital portion of the pension relating, *inter alia*, to tax implications and interest rate applications. However, the specific calculations are not relevant to our holding in

Husband asserted that the act of electing Class AA status and the post-January 2002 increase in contribution rate from 5.0% to 6.25% constituted postseparation efforts and contributions such that the increased benefits should be excluded from the marital portion of the pension under *Berrington* and its progeny. Accordingly, Husband argued that the appropriate monthly figure based on SERS calculations would be $696 per month.

In its decision, the trial court relied upon this Court's decision in *Berrington*. The court accepted Wife's proposed valuation of the marital portion of the pension, including the increase pursuant to the Class AA election, and awarded her $199,926 to be paid in monthly installments of $1102.[9] Husband filed a motion for reconsideration, which was denied, and subsequently filed a notice of appeal to the Superior Court.

In a published opinion, the Superior Court reversed the decision of the trial court and concluded that the entirety of increased pension benefits was attributable to Husband's increased contributions and thus did not constitute marital property subject to equitable distribution. The court observed that Husband received an increase in benefits effective as of July 2001, and emphasized that the election also included Husband's affirmative agreement to increase his contribution rate from 5.0% to 6.25%, beginning in January 2002. The court found the language of the Class AA election form referencing the increased contributions to be "compelling evidence that the increased benefits were given in exchange for a

this case. We trust the trial court to make necessary findings of fact and address the details of application on remand.

9. Prior to the trial court's final decision in July 2004, the court ordered Husband to pay Wife a portion of the monthly benefit "equal to what [Husband] feels is her aggregate entitlement of pension proceeds." Tr. Ct. Order, 6/13/03. Any final calculation of pension distribution will have to consider the amount Husband paid pursuant to this order.

Husband also suggested in a letter to the trial court during this period that he might return to state employment due to the expenses involved in the divorce. We leave it to the trial court to resolve whether Husband has returned to work and what effect, if any, that decision has on Wife's entitlement to her portion of pension benefits, given the pension's prior entry into pay status.

participant's increased contributions." *Smith v. Smith*, 881 A.2d 855, 857 (Pa.Super.2005).

The court rejected Wife's claim that the increase in pre-December 2001 pension benefits was not directly tied to the increased contribution rate. Wife had observed that an individual such as Husband could have retired between July 2001, when the increase in benefits became effective, and December 31, 2001, prior to the January 1, 2002 effective date of the increased contribution rate. Accordingly, she argued that the increased contribution rate only related to the post-January 2002 increase in the benefits and did not relate to the increase in pension tied to pre-January 2002 employment. The Superior Court disagreed, finding that "the increased [SERS] multiplier is applied not only to benefits earned after Class AA election, but to Husband's entire pension, excepting military service." *Id.* at 857. "[T]he fact that a loophole existed which permitted participants to retire with amplified benefits prior to increasing their contributions does not affect our decision here; it was a fleeting opportunity that does not diminish the fact that the situation is a *quid pro quo*—greater benefits for higher contributions." *Id.* Finding that the increase in benefits was not automatic and could not be obtained passively, the Superior Court concluded that the increase in benefits was due to Husband's election of Class AA status and the subsequent postseparation contributions. Accordingly, the court concluded that the increase in the pension benefit fund was not marital property.

This Court granted Wife's petition for allowance of appeal. The parties focus their argument on this Court's fractured decision in *Berrington* and its progeny. Surprisingly, the parties fail to acknowledge that in 2004 the General Assembly amended relevant statutory language regarding marital property found in § 3501 of the Divorce Code, 23 Pa.C.S. §§ 3101, *et seq.* As discussed in detail below, the amendment specifically addressed the valuation of the marital portion of defined benefit plans and was expressly intended to supplant our

holding in *Berrington. See* 23 Pa.C.S. § 3501(c), cmt. ("New subsection (c) seeks to reverse *Berrington* . . . .").[10]

Prior to discussing the amendment to § 3501, however, we relate the parties' arguments. While acknowledging that postseparation increases in retirement benefits generally were not deemed marital property, Wife notes that in *Berrington* we carved out an exception for increases that do not result from the efforts or contributions of the employee-spouse. Wife contends that the total increase in Husband's pension benefits in the case at bar falls under that exception because the increase was not based on Husband's postseparation efforts or contributions. Wife notes that Act 2001–9 retrospectively increased pension benefits accrued prior to the effective date of July 2001, but prospectively increased contribution rates beginning in January 2002. In rejecting the argument that the contribution increase was a *quid pro quo*, she reasserts that a subset of SERS members, including Husband, could have retired between July 2001 and December 2001 and received the pension increase without ever paying the increased contribution. Wife contends, "In no way can it be said that the twenty-five (25%) percent increase of [Husband's] entire pension was 'purchased' by what amounts to seven (7) months of increased contributions of one and one-quarter (1¼%) percent." Brief for Wife at 11. Instead, she asserts that the total increase was the result of legislative action intended to pass on to SERS members the fruits of years of successful investments. Accordingly, Wife argues that the increase in benefits is marital property under the *Berrington* line of cases because the increase did not result from the postseparation efforts or contributions of Husband.

**10.** As discussed below, our analysis in this case is based upon § 3501(c). Nonetheless, we observe that we would have employed the same logic if we had applied our decision in *Berrington* and its progeny. As we have pursuant to the statutory analysis, we would have concluded that most of the enhancement of benefits resulted from legislative action rather than any minor postseparation efforts or contributions of Husband, rendering such increase in value marital property subject to equitable distribution; and, conversely, to the extent a small amount of the postseperation increase in value resulted from Husband's postseperation contributions, this increase is nonmarital and belongs solely to Husband.

In response, Husband contends that the Superior Court correctly concluded that the pension increase resulting from his election of Class AA status was not marital property. Rather, the election and related mandatory contributions from January 2002 to July 2002 constitute postseparation efforts and contributions, which under *Berrington* place the increase in the pension benefit outside the marital estate. Husband observes that the increase occurred over six years after the date of separation and three years after the trial court's order dividing the pension and instructing the parties to file a proposed QDRO. Husband notes that the option to elect the increase did not exist and could not have been contemplated prior to the separation, and thus should not be included in marital property.

Instead, Husband asserts that the governing question should be whether "the participant-spouse g[a]ve any *consideration* for the increase in pension benefits." Brief for Husband at 11 (emphasis in original). He contends that he did give consideration, noting that had he not elected Class AA status and subsequently increased his contribution rate, his pension would not have increased. Regarding Wife's argument that Husband could have retired during a limited period without incurring any additional obligation, Husband notes that this did not occur in the case *sub judice*, and that a distribution of pension funds should not be based on what might have occurred.

The question raised by this case is not a question of discretion in the application of the law, but a legal question concerning the definition of marital property in the context of defined benefit pensions. Accordingly, the standard of our review is *de novo* and our scope of review is plenary. *See Buffalo Township v. Jones*, 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002).

In prior cases, this Court has struggled to reach a consensus regarding how to provide economic justice in the equitable division of pension benefits. The difficulty in distributing pension benefits results from determining what portion of the

pension, if any, constitutes "marital property" subject to equitable distribution. The Divorce Code, generally, limits "marital property" to all property acquired by either party between the date of marriage and the date of final separation, 23 Pa.C.S. § 3501(a), and therefore excludes "[p]roperty acquired after final separation until the date of divorce, except for property acquired in exchange for marital assets." 23 Pa.C.S. § 3501(a)(4). An employee-spouse's pension benefit does not fit cleanly into either the marital or the postseparation category. On one hand, the pension can be viewed as a fruit of the marriage and the product of both spouses' efforts during the marriage, thus warranting consideration as marital property subject to distribution to the non-employee-spouse. On the other hand, the eventual pension benefit may also result partially from the employee-spouse's continued employment after separation, and thus, partially, would be non-marital property not subject to distribution. As a further complication, in many cases, the final benefit cannot be determined until the date of retirement because the benefit is calculated based on the number of years in service, the final salary, and any changes in the pension benefit formula.

In *Berrington v. Berrington*, 534 Pa. 393, 633 A.2d 589 (1993), we considered how to calculate the non-employee-spouse's share of a defined benefit pension fund, the total of which was calculated based, *inter alia*, on an averaged final salary and total years of service, only a portion of which coincided with the marriage.[11] The parties agreed that the non-employee-spouse would receive 60% of all marital property, including the pension benefits, but they could not determine how to calculate the value of the marital portion of the

---

11. We distinguished defined benefit and defined contribution plans in *Berrington*. "In a defined benefit plan, the benefit which is promised is calculated by a formula defined in the pension plan provisions." 633 A.2d at 590 n. 1. "The benefits to be paid in the defined contribution plan, however, unlike those in the defined benefit plan, are not fixed, for they depend upon the performance of investments which are made with the contributions." *Id. Berrington* also involved division of an executive benefit plan and a supplemental plan, the details of which are not relevant to our current discussion, which concerns only defined benefit plans.

pension. The primary issue was whether the spouse's share of the pension should be calculated based upon the salary at the time of separation or at the time of an eventual postseparation retirement.

The majority held that "the spouse not participating may not be awarded any portion of the [employee]-spouse's retirement benefits which are based on postseparation salary increases, incentive awards or years of service. Any retirement benefits awarded to the non-[employee-]spouse must be based only on the [employee]-spouse's salary at the date of separation." *Id.* at 594. However, we excepted from this exclusion, and thus included in the marital estate, "increases in retirement benefits payable to the employee-spouse between the date of marital separation and the date the non-[employee-]spouse begins receiving benefits which are not attributable to the efforts or contributions of the [employee]-spouse." *Id.* The Court therefore approved the following calculation: wife's percentile share of the total marital estate multiplied by the coverture fraction multiplied by the pension benefit at the date of retirement, but calculated using the *salary at the date of separation. Id.* at 594.

Prior to his elevation to Chief Justice, Mr. Justice Cappy filed a dissenting opinion challenging several of the majority's assumptions.[12] First, he noted that the majority assumed that the employee-spouse had "acquired the right to receive, at the very minimum, a pension benefit calculated by using the participant's salary as of the date of separation." *Id.* at 595 (Cappy, J., dissenting). Secondly, it assumed that "an asset cannot be marital if it depends on any efforts or contributions made after separation." *Id.* (Cappy, J., dissenting). Finally, the majority's formula assumed that any postseparation increase in salary could only be attributable to postseparation enhancement of skills, as opposed to skills developed during the marriage. Mr. Justice Cappy noted that salaries may decrease postseparation resulting in decreased total benefits,

12. As the Chief Justice was a Justice during the development of all of the precedent discussed herein, with the greatest respect, we will refer to him as "Mr. Justice Cappy" hereinafter.

and that pensions might not have vested prior to separation, requiring the continued postseparation employment of the employee-spouse to realize the benefit accrued during the marriage.

He noted that under the facts of *Berrington*, at the date of separation, "the parties had not acquired any right to a specific amount of money for the years worked prior to separation," but rather "an inchoate right ... to pay them benefits for the years worked during the marriage based upon a particular formula set forth in the pension plan contract upon the occurrence of certain post-separation contingencies." *Id.* (Cappy, J., dissenting). He viewed the asset earned during the marriage as a *"promise* from the employer to make deferred compensation payments (for the years of the marriage) based upon a formula that can produce *higher or lower* pension benefits than those calculated based upon the employee's earnings as of the date of separation." *Id.* at 598 (Cappy, J., dissenting) (emphasis in original). He therefore argued in favor of a method for distribution of non-vested pension benefits that would only exclude from marital property the cash actually contributed by the employee-spouse postseparation and would defer distribution until retirement.

Mr. Justice Montemuro also dissented. He noted that, prior to the majority's decision, there were two distinct methods of distributing pension benefits. The immediate offset method, whereby the present value of the pension benefit is calculated and the non-employee-spouse receives an offsetting portion of the marital assets to compensate for the employee-spouse's eventual receipt of the pension benefits, a method that provides ex-spouses closure. Alternatively, when the marital estate is not sufficient to allow for the immediate offset or the pension has not vested, the courts order a deferred distribution, specifying an allocation formula to be applied to the eventual pension benefit.

The use of the coverture fraction in the deferred distribution formula, according to Mr. Justice Montemuro, alleviates the need for present value determinations. As previously noted, the coverture fraction represents the marital portion of

the total employment: the numerator is the period of time the employee-spouse was a participant in the plan during the marriage prior to final separation and the denominator is the total period of participation in the plan. Using this simple formula, the marital portion of the pension is determined by multiplying the pension benefit actually received at retirement by the coverture fraction. He asserted that the use of the coverture fraction provides economic justice in dividing the marital and non-marital portions of the pension: "with the passage of time, the non-employee-spouse will receive a decreasing percentage of an increasing benefit." *Id.* at 600 (Montemuro, J., dissenting).

Several years later, in *Gordon v. Gordon*, 545 Pa. 391, 681 A.2d 732 (1996), the Court considered the valuation of the marital portion of a pension fund already in pay status, where early retirement inducements were accepted by the employee-spouse after the separation. The trial court divided the marital estate equally between the parties and, in connection with the utilization of the immediate offset method of distribution, valued the marital portion of the pension benefits by applying the coverture fraction to the pension's present value. The question before this Court concerned whether the enhancements to the pension benefits resulting from the employee-spouse's election of early retirement constituted postseparation efforts or contributions, and thus non-marital property not subject to equitable distribution. *Id.* at 733 (Opinion Announcing the Judgment of the Court ("OAJC")).[13]

In that case, the employer offered the employee-spouse incentives in the form of "supplemental retirement income for a period of time based on years of service, a bonus based on bonuses paid in recent years, and an annuity program (OR-BIT), in which the employee paid 27% of the cost of the annuity and the employer paid 73% of the cost." *Gordon*, 681 A.2d at 735 (footnote omitted). The OAJC observed that the

13. The Court also addressed the question of whether the *Berrington* analysis applied to cases involving the immediate offset method of distribution as well as the deferred distribution method. The OAJC concluded that the immediate offset method of calculation should also utilize the salary at the date of separation.

incentives were not part of the employee-spouse's salary at the time of separation, but contended that they could be considered marital property under *Berrington* because the benefits did not result from postseparation actions or contributions of the employee-spouse, with the exception of the employee-spouse's monetary contribution relating to the annuity.

The OAJC identified three questions relevant to the determination of whether the benefits should be included in the marital property: (1) were there increases in retirement benefits payable to the employee-spouse; (2) were the increases payable between the time of separation and the time the non-employee-spouse began receiving benefits; and (3) did the increases result from the postseparation efforts or contributions of the employee-spouse? The OAJC found the first two questions satisfied because it was plain that there were increases in retirement benefits that were payable to the employee-spouse and became payable between the time of final separation and the time the employee spouse began receiving benefits. Regarding whether the increases resulted from the postseparation efforts of the employee-spouse, the OAJC concluded that the employee-spouse had not contributed anything to trigger the supplemental retirement income and bonuses because those early retirement benefits resulted simply from the years of prior service. Thus, the first two incentive packages were includable as marital property. Conversely, the employee-spouse did contribute to the ORBIT annuity by paying 27%, or $27,000, post-retirement from non-marital funds. Accordingly, the OAJC included in the marital estate only the 73% of the ORBIT annuity paid by the employer, finding that the 73% did not result from postseparation efforts of the employee-spouse. However, recognizing that the early retirement inducements resulted not just from the employee-spouse's employment during marriage but from his entire period of employment, the OAJC applied the coverture fraction to these inducements and awarded the non-employee-spouse her share of the marital estate.

Mr. Justice Castille differed regarding the supplemental retirement income and bonus packages, which he concluded

should be excluded from marital property. He asserted that the *Berrington* rationale should not apply to an immediate offset situation, which does not require the non-employee-spouse to wait for distribution. Additionally, he argued that the retirement incentives should be excluded from the marital property because they did not relate to the pre-separation employment of the employee-spouse but resulted only from a postseparation reorganization. He also posited that the employer's contribution to the annuity should be excluded from marital property because the incentive was offered after separation.[14]

Madame Justice Newman filed a concurring opinion joining the OAJC but criticizing Justice Castille's concurring and dissenting opinion, concluding that "the increased benefits are part of the participant spouse's retirement package based on years of service during the marriage and are not the product of any postseparation efforts or contributions of the participant spouse." *Gordon*, 681 A.2d at 738 (Newman, J. concurring).[15]

14. Mr. Justice Zappala, now Chief Justice Emeritus, in a concurring and dissenting opinion joined by Mr. Justice Nigro, agreed with Mr. Justice Castille's concurring and dissenting opinion except as it related to the basis for excluding, in its entirety, the early retirement annuity. Accordingly, as the Court was equally divided on the inclusion of the retirement incentives in marital property, the decision of the Superior Court excluding the incentives from marital property was affirmed.

15. This Court has splintered in its decisions regarding the division of pension benefits in several other cases since *Gordon*. In *Brown v. Brown*, 547 Pa. 360, 690 A.2d 700 (1997), Justices Flaherty, Cappy, and Newman favored affirming a decision finding increases to be marital property where the increases resulted from a change in the pension formula upon the potential postseparation attainment of twenty or twenty-five years of service constituted marital property. The Opinion in Support of Affirmance (OSA) opined that the application of the coverture fraction accounted for the postseparation effort expended by the employee-spouse because the non-employee-spouse's share would decrease with each additional year of service. Justices Zappala, Castille, and Nigro contended in the Opinion in Support of Reversal (OSR) that the increased benefits did not occur merely by the passage of time but instead were due to husband's efforts working additional years after separation in order to attain the required years of service.

In another split decision, in *Meyer v. Meyer*, 561 Pa. 225, 749 A.2d 917 (2000), we considered whether an increase in pension benefits upon early retirement constituted marital property. Relying upon the

In 2004, however, the legislature attempted to address the confusion in our law by adding a subsection to the Divorce Code regarding the distribution of defined benefit pensions.[16] In relevant part, § 3501(c) provides:

(c) Defined benefit retirement plans.-Notwithstanding subsections (a)[General Rule regarding marital property], (a.1) [Measuring and determining the increase in value of non-marital property] and (b)[Presumption that all property acquired during the marriage is marital]:

(1) In the case of the marital portion of a defined benefit retirement plan being distributed by means of a deferred distribution, the defined benefit plan *shall be allocated between its marital and nonmarital portions solely by use of a coverture fraction.* The denominator of the coverture fraction shall be the number of months the employee spouse worked to earn the total benefit and the numerator shall be the number of such months during which the parties were married and not finally separated. The benefit to which the coverture fraction is applied

rationale in the plurality opinion in *Gordon*, Madame Justice Newman writing for herself and three other justices, held that the increases in the pension benefits were not due to any efforts or contributions by the employee-spouse, but instead resulted in substantial part from the years of service during the marriage, despite the need to "purchase" several additional years of service. She also noted that the contribution of the additional years was compensated by the application of the coverture formula. Mr. Justice Castille, joined by two justices, dissented based on his concurring and dissenting opinion in *Gordon,* opining that "early retirement inducements accepted by an employee-spouse after separation should not be considered marital property where such inducements did not exist prior to the parties' separation." *Id.* at 920 (Castille, J., dissenting).

16. Although it originally was applicable only to equitable distribution proceedings commenced on or after the effective date of January 28, 2005, the legislature later declared that "the provisions of 23 Pa.C.S. § 3501(c) shall apply to all equitable distribution proceedings pending on or after the effective date of this section." Act of June 15, 2005, P.L. 7, No. 4, effective immediately. Accordingly, the amendment applies to the case at bar, which has been pending since the late 1990s. We acknowledge, however, that the trial court did not have the benefit of the amendment when it rendered its decision in July 2004. Although the Superior Court cited the new subsection, it did not acknowledge the fact that it was a new amendment to the Divorce Code, or recognize the impact it had on our caselaw.

*shall include all postseparation enhancements except for enhancements arising from postseparation monetary contributions made by the employee spouse,* including the gain or loss on such contributions.

(2) In the case of the marital portion of a defined benefit retirement plan being distributed by means of an immediate offset, the defined benefit plan *shall be allocated between its marital and nonmarital portions solely by use of a coverture fraction.* The denominator of the coverture fraction shall be the number of months the employee spouse worked to earn the accrued benefit as of a date as close to the time of trial as reasonably possible and the numerator shall be the number of such months during which the parties were married and not finally separated. The benefit to which the coverture fraction is applied *shall include all postseparation enhancements up to a date as close to the time of trial as reasonably possible except for enhancements arising from postseparation monetary contributions made by the employee spouse,* including the gain or loss on such contributions.

23 Pa.C.S. § 3501 (emphasis added).

Significantly, in its official comments, the legislature specifically addressed this Court's prior holdings regarding the distribution of defined benefit pensions, criticizing the lead opinion in *Berrington,* which valued the pension utilizing the salary at the time of separation, and commending the analysis offered in *Gordon* by Justices Flaherty, Cappy, and Newman, and by the Superior Court in *Holland v. Holland,* 403 Pa.Super. 116, 588 A.2d 58 (1991).

New subsection (c) seeks to reverse *Berrington v. Berrington,* 534 Pa. 393, 633 A.2d 589 (1993), to adopt a coverture fraction methodology along the lines of *Holland v. Holland,* 403 Pa.Super. 116, [588] A.2d 58 (1991), and to include all postseparation enhancements except for postseparation monetary contributions by the employee spouse in the value of the pension. The new language codifies the result reached by Justices Flaherty, Cappy and Newman regarding the postseparation retirement enhancements in *Gordon*

*v. Gordon,* 545 Pa. 391, 681 A.2d 732 (1996) (3–3 decision on this issue, affirming the Superior Court's exclusion of the enhancements from the marital estate). Three early retirement inducements were at issue in *Gordon.* The justices listed above opined that since no present efforts or contributions of the employee spouse were required to receive the supplemental retirement income and bonus inducements, they were includable in the marital estate. The third inducement was an annuity paid for partially by the employee spouse and partially by the employer. Justices Flaherty, Cappy and Newman would have included the portion of the annuity paid for by the employer in the marital estate. 23 Pa.C.S. § 3501(c), cmt.

■■■■ As we must defer to the legislature as the policy making body, we conclude that the holding in *Berrington* no longer controls regarding the use of the salary at time of separation. Instead, we honor the legislature's unequivocal intention to utilize the coverture fraction to provide economic justice between the parties, as discussed by the Superior Court in *Holland:*

A delayed distribution of pension benefits requires the non-employed spouse to wait until some indefinite time in the future to receive the marital share. To compensate for this postponement of benefit, that spouse is permitted to enjoy increases in value occasioned by continued employment of the worker. Also, the employed spouse increases the non-marital share of the benefits since continuing service enlarges the denominator. Further, later year wage increases are a product of experience and longevity which were developed during the marriage. The [employee-spouse] ... can look forward to the benefits which accrue from a vested pension. His former spouse is entitled to share in any increase in value of the marital share which may occur by [the employee-spouse's] continued employment.

*Holland,* 588 A.2d at 60. Accordingly, rather than using the salary at the time of separation, courts instead should allocate the pension "between its marital and nonmarital portions solely by use of a coverture fraction." 23 Pa.C.S. § 3501(c).

Thus, the non-employee spouse "is permitted to enjoy increases in value occasioned by continued employment of the worker." *Holland,* 588 A.2d at 60. In the simplest of cases, the determination of the marital portion of a defined benefit pension will entail a straightforward application of the coverture fraction to the final total value of the pension, even though the value has increased due to years of postseparation employment.

■ While "postseparation enhancements" in pension benefits are generally included in marital property, the legislature excluded "enhancements arising from postseparation monetary contributions made by the employee spouse." 23 Pa.C.S. § 3501(c). The statute, however, does not define the term "postseparation monetary contributions." Instead, the comments shed light on the term through the discussion of Justices Flaherty, Cappy and Newman's decisions in *Gordon.* The comments indicate that the Justices concluded that the postseparation enhancements in *Gordon* that resulted merely from continued employment, such as supplemental retirement income, bonus inducements, and the employer's portion of the annuity, were postseparation enhancements to be included in marital property. In contrast, the comments noted that the Justices only excluded from marital property the employee spouse's $27,000 postseparation monetary contribution to the annuity.

■ While the statute does not address, specifically, defined benefit plans involving regular and mandatory deductions from each paycheck, to the extent the same amount is deducted after separation as was deducted before, we do not believe that any additional enhancement that occurs post-separation can be deemed to "arise" from the postseparation payroll deductions so as to trigger the exclusionary language of § 3501(c)(1). Instead, we view regular payroll deductions as part and parcel of "the continued employment of the worker" as discussed in *Holland.*[17] To decide otherwise would create

17. As stated, we view an employee's payment of payroll deductions as an aspect of the employee's continued employment for purposes of determining whether other enhancements "arise" from the continued

the untenable result that the same postseparation enhancement would be included in marital property if the enhancement occurred in a pension without payroll deductions, but excluded in pensions with payroll deductions.

■ In this case, Husband's election of Class AA changed the applicable SERS multiplier from 2.0% to 2.5%, which in turn caused a 25% increase in his total pension benefits. Clearly, the change in the multiplier constitutes a "postseparation enhancement" under § 3501(c) because it did not exist prior to separation and it dramatically increased the total pension benefits. To determine whether the postseparation enhancement arose from a postseparation monetary contribution, we must look to the language of the SERS provisions.

The SERS provisions provide for two separate postseparation enhancements: one enhancement related to the pension amassed during the period of employment prior to July 1, 2001 and another enhancement related to the pension derived from post-June 30, 2001 employment. For ease of discussion and comparison, we first consider the postseparation enhancement in the pension that resulted from the increase in the SERS multiplier from 2% to 2.5% as applied to the calculation of the pension relating to post-June 30, 2001 employment.

As stated, the revision of the SERS statute provided that "a member of Class A . . . shall be classified as a Class AA member and receive credit for Class AA State service performed after June 30, 2001, *upon payment of regular member contributions* for Class AA service." 71 Pa.C.S. § 5306(a.1)(3) (emphasis added). The "regular member contributions for Class AA service" entailed a 6.25% deduction from each paycheck rather than the 5% deduction that Husband had been paying since the beginning of his employment, and would have continued paying if he had remained a Class A member.

payment of the deductions. We do not decide today whether the legislature intended for the value of the payroll deductions themselves to be included in the martial portion of the pension and equitable justice provided by way of the coverture fraction or whether the value of the payroll deductions should be excluded from the martial portion of the pension.

We conclude that the legislature in the SERS provision tied the enhancement of the post-June 30, 2001 pension (due to the use of the Class AA multiplier of 2.5% rather than the Class A multiplier of 2.0%) to the agreement to pay an additional 1.5 percent (the difference in the Class AA 6.25% payroll deduction and the Class A 5% payroll deduction) as of January 2002.

Accordingly, the postseparation enhancement of Husband's pension for his service after June 30, 2001, attributable to the additional 1.5% postseparation monetary contribution, should not be included in the martial portion of the pension subject to the coverture fraction. Wife, however, is entitled to include in the marital property the value of the pension benefit that would have resulted naturally from Husband's continued employment post-June 30, 2001 as a Class A member, and his concomitant payment of the 5% payroll deduction.[18]

The same analysis, however, does not apply to the postseparation enhancement of the pension accrued prior to July 1, 2001. Unlike the language in the SERS provision applicable to the enhancement of benefits for service after June 30, 2001 that directly tied the enhanced benefits to the 1.5% increase in the payroll deduction, the SERS statute specifically provides that a member of Class AA "shall receive Class AA service for all Class A State service ... performed before July 1, 2001." 71 Pa.C.S. § 5306(a.1)(3). In the legislation, the General Assembly made clear that its purpose was to pass on to state employees a share of the investment success enjoyed by SERS. Act of May 17, 2001, P.L. 26, No. 9. Despite his understandable protestations to the contrary, Husband made no postseparation monetary contribution to secure this benefit.[19] Indeed, if he had retired seven months earlier,

18. At the conclusion of this opinion, we explain in theory how to do the necessary calculation to effectuate this division. We cannot provide exact numbers as the record does not supply the necessary raw data, and so this must be left to the trial court on remand.

19. As mentioned previously, we would have reached the same decision under our old common law precedent. Under those cases, postseparation effort, as well as postseparation monetary contributions, was relevant to this analysis. *Berrington*, 633 A.2d at 594. We note that in addition to making no postseparation monetary contribution, Husband

the increase would have been paid to him without his ever paying even the additional 1.5% payroll deduction, that he claims entitles him to all of the increase. Thus, Class A members, including Husband, received the enhancement in the value of their pre-July 1, 2001 service merely by their continued employment and the act of electing Class AA, and not through any postseparation monetary contribution or effort. Accordingly, the postseparation enhancement of the pre-July 1, 2001 pension should be included in the marital portion of the pension subject to the coverture fraction.

In summary, the value of the pension subject to application of the coverture fraction should be the value of the pension for the service prior to July 1, 2001 calculated at the Class AA multiplier (2.5%) plus the value of the pension for the service after June 30, 2001 calculated at the Class A multiplier (2.0%). Thus, Husband's nonmarital property is the difference between the value of the post-June 30, 2001 pension calculated at the 2.5% multiplier and the value of the pension for the same period calculated at the 2.0% multiplier, an increase attributable to the 1.5% of additional payroll deduction that began postseparation. Stated differently, the portion of Husband's pension that is marital property subject to distribution through use of the coverture fraction is 100% of Husband's pre-June 30, 2001 pension and all of the post July 1, 2001 pension except that attributable to the 1.5% payroll deduction that Husband paid postseparation above his pre-separation payments.[20]

> expended no meaningful postseparation effort in furtherance of the pre-July 1, 2001 pension enhancement.

20. We note that the exhibits introduced before the trial court indicate that SERS is able to provide calculations of pension benefits based on different periods of employment and different class multipliers. We therefore presume that the necessary calculations of benefits will be easily derived. Although we defer to SERS for final pension calculation and the trial court for fact finding, for purposes of demonstration, we conclude that the following would approximate the formula to be applied: Coverture fraction (20.4 years of employment during marriage/30.58 years of total employment) × [Class AA Pre-July 1, 2001 pension benefit (2.5% × 29.58 years of service × final average salary) + Class A Post June 30, 2001 pension benefit (2.0% × 1 year of service × final average salary)].

Consequently, we reverse the decision of the Superior Court, which excluded from marital property any increase in the pension benefit, and remand to the trial court for further proceedings consistent herewith. We trust the trial court to implement this decision with due regard for changes that have occurred during the pendency of this case, including, without limitation, interest, taxes, prior payments from Husband to Wife, and the effect of Husband's continued state employment, if any.

Former Justice NEWMAN did not participate in the consideration or decision of this case.

Chief Justice CAPPY, Justice CASTILLE and Justice BALDWIN join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice EAKIN files a dissenting opinion.

Justice SAYLOR dissenting.

As the majority observes, neither party has briefed the proper application of Section 3501(c) of the Divorce Code, promulgated in 2004, *see* 23 Pa.C.S. § 3501(c), which is deemed controlling in this case. While I do not disagree that the statute is on its face controlling, it became applicable to the present proceedings only after the presentation of argument in the Superior Court,[1] and is not addressed in briefs presented by the parties to this case. Therefore, at a minimum, supplemental briefing should be required to obtain the benefit of advocacy before rendering a final decision attempting to settle the law this area.

This case has both singular aspects, involving the post-hoc application of a unique retirement benefit, as well as more ordinary ones, such as delineating the range of post-separation retirement benefits that is exposed to the application of a coverture fraction. With regard to the latter, the majority

---

1. *See* 23 Pa.C.S. § 3501, Historical and Statutory Notes (making Section 3501(c) applicable to equitable distributions pending on or after a June, 2005 effective date).

encounters a number of conceptual difficulties occasioned by the unique facts of the case. For example, it is undisputed that the employee-spouse withdrew and retained all of his monetary contributions to his retirement plan, *see* R.R. at 30a, and no claim is presently before this Court pertaining to a specific accounting for such sum. Presumably for these reasons, the majority elects not to consider whether the portion of those contributions that were contributed post-separation fit within the critical passage of Section 3501(c) exempting "enhancements arising from postseparation monetary contributions made by the employee spouse, including the gain or loss on such contributions." 23 Pa.C.S. § 3501(c)(2). *See* Majority Opinion at 100, & n. 17, 938 A.2d at 258 & n. 17. Yet, despite some awkwardness in working its way around this obstacle, the majority finds itself able to announce that the corresponding portion contributed by the employer (or the fund) does not arise from any post-separation contribution. *See id.*

While it is not impossible to do otherwise, an orderly resolution of the question of whether a benefit "aris[es] from postseparation monetary contributions" would ordinarily begin with consideration of whether such contributions are in issue in the first instance, followed by an evaluation of the connection between the contributions and the benefit. The majority's inability to follow such an orderly path due to the unique circumstances of this case strongly suggests against its use as a vehicle to construe the material passage of Section 3501(c).

Indeed, despite its efforts, the majority, by its rationale, facially appears to categorize an employee-spouse's actual postseparation monetary contributions (for lack of a better term) as something other than "postseparation monetary contributions" under Section 3501(c). For example, the majority indicates that "we view regular payroll deductions as part and parcel of 'the continued employment of the worker' as discussed in *Holland.*" Majority Opinion at 102, 938 A.2d at 259. This is the precise category of benefits that *Holland,* in the same sentence, specifically designates as benefits "the [non-

employee] spouse is permitted to enjoy." *Holland v. Holland,* 403 Pa.Super. 116, 588 A.2d 58, 60 (1991).[2]

The majority's sole justification for its decision that the bulk of Husband's post-separation monetary contributions are not "postseparation monetary contributions" for purposes of its opinion is contained in a single sentence: "To decide otherwise would create the untenable result that the same postseparation enhancement would be included in marital property if the enhancement occurred in a pension without payroll deductions, but excluded in pensions with payroll deductions." Majority Opinion at at 102–03, 938 A.2d at 259. This rationale, however, appears to assume that the Legislature intended application of a coverture fraction either to both of post-separation employee and employer contributions or to neither. This, however, appears to be belied by the Official Comment to Section 3501(c): "New subsection (c) seeks to . . . . include *all postseparation enhancements except for postseparation monetary contributions by the employee spouse* in the value of the pension." 23 Pa.C.S. § 3501(c) (emphasis added); *accord* 17 WEST'S PA. PRACTICE, FAMILY LAW § 23:2 (6th ed. 2007) (explaining that post-separation increases in value based upon years of service are subject to the coverture fraction, but that the employee's post-separation monetary contributions themselves are not). This comment develops specific facts from the decision in *Gordon v. Gordon,* 545 Pa. 391, 681 A.2d 732 (Pa.1996), crediting the plurality decision to divide a portion of an early retirement benefit between marital and non-marital portions according to the proportion of the employee and employer contributions, respectively.[3]

**2.** The majority's differential treatment of percentage-based increases is reflected in a separate passage of its opinion dealing with the more unique legal aspects of this case.

**3.** While *Gordon* is certainly distinguishable on its facts because it involved an early retirement incentive entailing a one-time post-separation contribution, the Legislature made general reference to the case in direct connection with the devising of a scheme for the equitable division of defined benefit retirement plans. *See* 23 Pa.C.S. § 3501(c) (captioned "Defined benefit retirement plans"). Therefore, the Assembly's focus on the character of the division in *Gordon,* as opposed to the particular type of benefit at issue in the case, seems apparent. *See* 23

The majority's perspective places the central focus on whether contributions were in the same amount before and after separation and minimizes what appears to be the Legislature's simpler focus on the pre- or post-separation timing of the employee contributions. This leads to the rather incongruous holding that, while about seventy-seven percent of Husband's post-separation contributions is not a "postseparation monetary contribution" for purposes of the majority opinion, the other twenty-three percent is, in fact, a postseparation monetary contribution. *See* Majority Opinion at 104, 938 A.2d at 260. The majority also finds the employer-added benefit attributable to this twenty-three percent of Husband's post-separation monetary contributions to be exempt from the application of the coverture fraction, *see id.*, despite the rather clear parallel to *Gordon* as developed in the Official Comment to Section 3501(c).

It is my considered opinion that there are reasonable perspectives concerning the application of Section 3501(c) that are not being considered because of the unique circumstances of this case and the absence of critical advocacy. Thus, I cannot support the majority opinion, and instead, would either require additional briefs or dismiss this case as improvidently granted.

Justice EAKIN dissenting.

I must differ from my learned colleagues' conclusion that, except for the 1.5% increase in payroll deductions after July 1, 2001, the increased benefits did not arise from husband's postseparation contributions. In fact, without husband's continued employment efforts from the time of separation in 1995 until the enactment of Act 2001–9 in 2001, the opportunity to

Pa.C.S. § 3501(c), Official Comment (crediting the position from *Gordon* that "would have included the portion of the [early retirement benefit] *paid for by the employer* in the marital estate" (emphasis added)); *Gordon*, 545 Pa. at 399, 681 A.2d at 736 (holding that, "[t]he portion of the [retirement-plan] annuity paid for by the employer, *but not the portion paid for by [the employee]*, . . . is includable in the marital estate. . . .").

elect Class AA status would not have been available, and the pension's value could not have increased. Husband's continued employment resulted in his being able to elect this status, which triggered the increase in value; that is, the increase necessarily resulted from husband's actions, nearly six and a half years of continued employment after separation.

Husband's efforts may not have been heroic or entrepreneurial, but they were his efforts alone. Whether this was a windfall to him or not, windfalls after the fact are still after the fact. If the nature of this case causes us to craft a rule that depends on the quantity or quality of his efforts, vis à vis the amount of the unanticipated increased benefit, there will be no closure in any case. The parties separated in January, 1995. The pension was divided by order of July, 1998. The legislative change was effective in July, 2001, and husband retired in July, 2002, seven and a half years after separation.

While a portion of a pension earned during coverture is appropriately awarded, there comes a point where finality must attach and litigation over "marital property" ends. We are now twelve and a half years postseparation. Opportunities afforded to and contributions made by either party after the relevant date for valuing marital assets should not change the basic scheme of distribution of property made as part of the divorce. As I find the entire enhancement of the pension was the result of husband's postseparation effort, it should not change the mathematics agreed to by the parties when they divided this pension.